Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Counsel for Plaintiff

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL MASTERSON, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CHEETAH MOBILE INC., SHENG FU, YUK KEUNG NG, and KA WAI ANDY YEUNG<br><br>Defendants. | Case No. 2:17-CV-08141-R-AFM<br><br>CLASS ACTION<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Plaintiff Michael Masterson ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and

Exchange Commission ("SEC") filings, wire and press releases published by and regarding Cheetah Mobile Inc. ("Cheetah" or the "Company"), analysts' reports and advisories about the Company, interviews with former Cheetah employees, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired the American Depositary Shares ("ADSs") of Cheetah from May 8, 2014 through October 25, 2017, both dates inclusive (the "Class Period"). Plaintiff seeks to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

2. Cheetah is a China-based developer of mobile (iOS and Android) and PC applications ("apps"). Cheetah's revenue primarily comes from advertising. Cheetah generates revenue by referring user traffic and selling advertisements on their apps.

3. Cheetah generally charges its advertising customers based on user engagement, measured in part by how many "clicks" an ad that is placed on Cheetah's apps generates. The more clicks an ad receives from internet users, the more Cheetah is able to charge its advertising customers.

4. In its SEC filings, Cheetah states that it generates advertising revenue based in part on the number of clicks that ads placed on Cheetah's app receive. Cheetah further states that one of the most significant factors affecting its advertising revenue is Cheetah's ability to increase user engagement – the more engaged the user is, the more likely he/she is to click on ads.

5. In numerous press releases, Cheetah falsely touted that the Company's increase in advertising revenue was driven by Cheetah's growing mobile user base.

6. Unbeknownst to Cheetah's advertising customers and investors, however, Cheetah extensively utilized bots and "click farms" to impersonate real users and fraudulently generate clicks on ads that Cheetah's customers placed on its apps. By generating fraudulent clicks, Cheetah overcharged its clients for false "click throughs" on ads. It also overstated to advertising clients the effectiveness of their advertisements on Cheetah's apps. As a result, Cheetah's clients were paying higher rates to advertise on Cheetah and also running more advertisements more frequently. This fraud resulted in Cheetah receiving much higher revenues – as a result of its fraudulent practices.

7. Cheetah thus concealed from the investing public that in actuality, a major factor in generating its advertising revenue was its ability to continue using bots and click farms to generate fake clicks on ads - without its advertising customers finding out that they were paying for clicks made by bots rather than clicks from potential customers.

8. On October 26, 2017, an investment research firm issued a report detailing numerous frauds at Cheetah, including Cheetah's extensive use of bots and click farms to generate fake clicks to drive up advertising revenue. Cheetah's stock price dropped as a result of this disclosure of Cheetah's fraud, damaging Plaintiff and other investors.

9. Former employees in Cheetah's advertising division confirmed to Plaintiff's investigator that Cheetah utilized bots to generate fraudulent clicks.

10. This revelation has jeopardized Cheetah's advertising revenue. Indeed, Cheetah's biggest advertising clients have started to reduce their advertising on Cheetah because of this fraud. In 2016, Facebook announced that it would significantly reduce its ads on Cheetah because Facebook's new internal

metric discovered that ads on Cheetah were not performing well – likely because a large portion of the clicks were done by bots rather than potential customers.

11. In November 2017, Cheetah announced that its advertising revenue had fallen nearly 15% year-over-year, in part as a result of advertisers discovering Cheetah's fraudulent practice of overstating clicks and overcharging for advertising. Cheetah's advertising revenue from its apps will likely continue to be negatively affected as more advertisers realize that they were paying for fake clicks generated from bots.

## JURISDICTION AND VENUE

12. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

13. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

14. Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the Company conducts business within this judicial district.

15. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

16. Plaintiff Michael Masterson, as set forth in his PSLRA certification previously filed with the Court, purchased Cheetah ADSs at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

17. Defendant Cheetah is a China-based developer of mobile (iOS and Android) and PC applications. The Company is incorporated in the Cayman Islands and its principal executive offices are located at Building No. 8, Hui Tong Times Square, Yaojiayuan South Road, Beijing, People's Republic of China. Cheetah's ADSs are traded on the New York Stock Exchange ("NYSE") under the ticker symbol "CMCM."

18. Defendant Sheng Fu ("Fu") has been Cheetah's Chief Executive Officer throughout the Class Period. Fu has also been a director of the Company since December 2010.

19. Defendant Ka Wai Andy Yeung ("Yeung") was Cheetah's Chief Financial Officer from January 2014 until his resignation in March 2017.

20. Defendant Yuk Keung Ng ("Ng") has been Cheetah's Principal Financial Officer since March 2017. Ng has also been a director of Cheetah since July 2012.

21. Defendants Fu, Yeung, and Ng are sometimes referred to herein as the "Individual Defendants."

22. Each of the Individual Defendants:

(a) directly participated in the management of Cheetah;

(b) was directly involved in the day-to-day operations of Cheetah at the highest levels;

(c) was privy to confidential proprietary information concerning Cheetah and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of Cheetah's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning Cheetah; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

23. Cheetah is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

24. The scienter of the Individual Defendants and other employees and agents of Cheetah is similarly imputed to Cheetah under *respondeat superior* and agency principles.

25. Cheetah and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

26. Cheetah is a China-based developer of mobile and PC applications. Its most popular apps include Clean Master, Battery Doctor, and CM Security.

27. Cheetah's revenue primarily comes from advertising. Cheetah generates revenue by referring user traffic and selling advertisements on their apps. In its SEC filings covering the years 2014 to 2016, Cheetah referred to this revenue stream as "Online Marketing Services".

28. Online Marketing Services accounted for 72.1%, 87.0%, and 86.6% of Cheetah's total revenues in 2014, 2015, and 2016, respectively.

29. Cheetah charges its advertising clients based on, among other factors, how many "clicks" ads placed on Cheetah's apps generates.

### Materially False and Misleading Statements

***False and Misleading SEC Filings***

30. On May 5, 2014, Cheetah filed a Form F-1/A Registration Statement in connection with its initial public offering ("IPO"). The SEC declared the Registration Statement effective on May 7, 2014. The Form F-1/A was signed by Defendants Fu, Yeung, and Ng. The Prospectus accompanying the Registration Statement was made final and filed with the SEC on May 8, 2014 (henceforth, "Registration Statement" refers to both the Registration Statement and Prospectus). The Registration Statement stated the following about how Cheetah generates revenue from its Online Marketing Services:

> We generate online marketing revenues by referring traffic from our platform to e-commerce companies and search engine providers and by selling advertisements. ***The fee arrangements generally include cost per time, <u>cost per click</u> or cost per sale for actions that originate from our platform. We believe that the most significant factors affecting revenues from online marketing services include:***
>
> • ***User base and user engagement.*** We believe a large, loyal and engaged user base would help us retain existing business partners and attract more business partners seeking online marketing services and at the same time gives us more pricing power. ***It also results in more user impressions, clicks, sales or other actions that generate more fees for performance-based marketing.***

(emphasis added).

31. On April 21, 2015, Cheetah filed a Form 20-F annual report for the fiscal year ended December 31, 2014 (the "2014 20-F") with the SEC. The 2014 20-F was signed by Defendant Fu. The 2014 20-F also contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Fu and Yeung attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

32. The 2014 20-F reported RMB1,339,250,000 in revenue from Online Marketing Services, and stated the following regarding how Cheetah generates revenue from its Online Marketing Services:

> We generate online marketing revenues primarily by referring user traffic and selling advertisements on our mobile and PC platforms. ***The fee arrangements generally include cost per sale, <u>cost per click,</u> cost per time or cost per installation for actions that originate from our platform. <u>We believe that the most significant factors affecting revenues from online marketing include:</u>***
>
> - ***User base and user engagement***. We believe a large, loyal and engaged user base would help us retain existing customers and attract more customers seeking online marketing services and at the same time gives us more pricing power. ***It also results in more user impressions, clicks, sales or other actions that generate more fees for performance-based marketing.*** In particular, a large and engaged mobile user base is crucial for the long-term growth of our online marketing services. We plan to increase our spending on marketing activities to further grow our global mobile user base.

(emphasis added)

33. On April 22, 2016, Cheetah filed its 20-F for the fiscal year ended December 31, 2015 (the "2015 20-F") with the SEC. The 2015 20-F was signed by Defendant Fu. The 2015 20-F also contained signed SOX certifications by Defendants Fu and Yeung attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

34. The 2015 20-F reported RMB3,283,423,000 in revenue from Online Marketing Services, and stated the following regarding how Cheetah generates revenue from its Online Marketing Services:

> We generate online marketing revenues primarily by providing mobile advertising services to advertisers worldwide, as well as referring user traffic and selling advertisements on our mobile and PC platforms. ***The fee arrangements generally include <u>cost per click</u>, cost per installation, cost per activation and cost per sale that originate from our platform, and cost per period. <u>We believe that the most significant factors affecting revenues from online marketing include:</u>***

- ***User base and user engagement.*** We believe a large, loyal and engaged user base would help us retain existing customers and attract more customers and business partners seeking online marketing services and at the same time gives us more pricing power. ***It also results in more user impressions, clicks, sales or other actions that generate more fees for performance-based marketing.*** In particular, a large and engaged mobile user base is crucial for the long-term growth of our online marketing services. We plan to introduce more products to increase our mobile users' engagement and amount of time spent on our products.

(emphasis added)

35. On April 26, 2017, Cheetah filed its 20-F for the fiscal year ended December 31, 2016 (the "2016 20-F") with the SEC. The 2016 20-F was signed by Defendant Fu. The 2016 20-F also contained signed SOX certifications by Defendants Fu and Ng attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

36. The 2016 20-F reported RMB3,950,886,000 in revenue from Online Marketing Services, and stated the following regarding how Cheetah generates revenue from its Online Marketing Services:

> We generate online marketing revenues primarily by providing mobile advertising services to advertisers worldwide, as well as referring user traffic and selling advertisements on our mobile and PC platforms. We charge fees for our online marketing services generally based on three general pricing models, which include cost over a time period, cost for performance basis and cost per impression basis. ***Cost for performance basis refers to, among others, <u>cost per click</u>, cost per installation, cost per activation and cost per sale that originate from our platform, while cost per impression refers to cost based on the number of impressions over a period. <u>We believe that the most significant factors affecting revenues from online marketing include</u>:***

- ***User base and user engagement***. We believe a large, loyal and engaged user base would help us retain existing customers and attract more customers and business partners seeking online marketing services and at the same time gives us more pricing power. ***It also results in more user***

> ***impressions, clicks, installations, or other actions that generate more fees for performance-based marketing.*** In particular, a large and engaged mobile user base is crucial for the long-term growth of our online marketing services. We plan to further improve our products and introduce more products to increase our mobile users' engagement and amount of time spent on our products.

37. Cheetah's statements in its Registration Statement and in the 2014, 2015, and 2016 20-Fs referenced above were misleading because they failed to disclose that Cheetah relied extensively on bots to generate clicks on ads that Cheetah's advertising customers place on Cheetah's apps. Thus, a significant factor contributing to Cheetah's revenue from Online Marketing Services was actually Cheetah's ability to continue using bots and click farms to generate clicks, without its customers finding out the truth.

***False and Misleading Press Releases***

38. During the Class Period, Cheetah issued numerous press releases touting its rising advertising revenue. In these press releases, Cheetah falsely attributed the increases in advertising revenue to the Company's growing user base.

39. On June 2, 2014, Cheetah issued a press release announcing its financial results for the first quarter of 2014. This press release was also filed on June 3, 2014 with the SEC as an exhibit to a Form 6-K, with the cover page signed by Defendant Yeung. In this press release, Cheetah stated: "Revenues from online marketing services increased by 97.2% to RMB232.2 million (US$37.4 million) in the first quarter of 2014 from RMB117.8 million in the prior year period. ***This increase was due to growth in marketing revenues from key online marketing customers driven by significant growth in our user traffic on the Company's online marketing platforms."*** (emphasis added).

40. On August 19, 2014, Cheetah issued a press release announcing its financial results for the second quarter of 2014. This press release was also filed

on August 20, 2014 with the SEC as an exhibit to a Form 6-K, with the cover page signed by Defendant Yeung. In this press release, Cheetah stated: "Revenues from online marketing services increased by 142.7% to RMB360.9 million (US$58.8 million) in the third quarter of 2014 from RMB148.7 million in the prior year period. ***This increase was due to growth in marketing revenues from key online marketing customers, driven by significant growth in user traffic on the Company's online marketing platforms*.**" (emphasis added).

41. On November 10, 2014, Cheetah issued a press release announcing its financial results for the third quarter of 2014. This press release was also filed on November 12, 2014 with the SEC as an exhibit to a Form 6-K, with the cover page signed by Defendant Yeung. In this press release Cheetah stated: "Revenues from online marketing services increased by 142.7% to RMB360.9 million (US$58.8 million) in the third quarter of 2014 from RMB148.7 million in the prior year period. ***This increase was due to growth in marketing revenues from key online marketing customers, driven by significant growth in user traffic on the Company's online marketing platforms.***" (emphasis added).

42. On March 20, 2015, Cheetah issued a press release announcing its financial results for the fourth quarter of 2014. This press release was also filed on March 23, 2015 with the SEC as an exhibit to a Form 6-K, with the cover page signed by Defendant Fu. In this press release, Cheetah stated: "Revenues from online marketing services increased by 109.9% to RMB446.1 million (US$71.9 million) in the fourth quarter of 2014 from RMB212.5 million in the prior year period. This increase was primarily driven by strong demand for our mobile advertising business in both the domestic and overseas markets as well as the rapid growth of the worldwide mobile advertising market. ***This increase was also due to growth in marketing revenues from key online marketing customers, driven by growth in user traffic on the Company's online marketing platforms.***" (emphasis added).

43. On November 17, 2015, Cheetah issued a press release announcing its financial results for the third quarter of 2015. This press release was also filed on November 18, 2015 with the SEC as an exhibit to a Form 6-K, with the cover page signed by Defendant Yeung. In this press release, Cheetah stated: "Revenues from online marketing services increased by 149.5% to RMB900.5 million (US$141.7 million) in the third quarter of 2015 from RMB360.9 million in the prior year period. Mobile advertising revenues represented approximately 72% of online marketing revenues in the quarter, which increased from approximately 21% of online marketing revenues in the prior year period. ***The increase in mobile advertising revenues was driven by the Company's growing global mobile user base, and strong demand from advertisers for the Company's mobile advertising services worldwide."*** (emphasis added).

44. On May 19, 2016, Cheetah issued a press release announcing its financial results for the first quarter of 2016. This press release was also filed on May 20, 2014 with the SEC as an exhibit to a Form 6-K, with the cover page signed by Defendant Yeung. In this press release, Cheetah stated: "Revenues from online marketing services increased by 69.7% to RMB992.3 million (US$153.9 million) in the first quarter of 2016 from RMB584.8 million in the prior year period. Mobile advertising revenues represented approximately 77% of online marketing revenues in the quarter, which increased from approximately 60% of online marketing revenues in the prior year period. ***The increase in mobile advertising revenues was driven by the Company's growing global mobile user base***, and increased demand from advertisers, including third-party advertising platforms, for the Company's mobile advertising services worldwide, as well as the monetization of light causal games through in-game advertising." (emphasis added).

45. These press releases are false and misleading because they omitted to disclose that a main driving force behind Cheetah's rising advertising revenue was

actually Cheetah's extensive use of bots and click farms to generate fraudulent clicks on ads that Cheetah's advertisers place on Cheetah's apps, causing advertisers to believe that their ads were performing better on Cheetah than they actually were.

**The Truth Emerges**

46. On October 26, 2017, Prescience Point Research Group published a report (the "Prescience Report") asserting, among other things, that Cheetah makes extensive use of bots and "click farms" to fraudulently click on ads that advertisers place on Cheetah's apps. Thus, a large portion of the user engagement and user traffic that advertisers thought they were getting by advertising on Cheetah were actually fake. The Prescience Report is attached hereto as Exhibit 1.

47. Following the publication of the Prescience Report, Cheetah ADSs fell $0.37 per share, or over 4%, from its previous closing price to close at $8.05 per share on October 26, 2017, damaging Plaintiff and other Cheetah investors.

48. Plaintiff's investigator interviewed two former Cheetah employees, who confirmed that Cheetah made extensive use of bots to fraudulently click on ads placed on Cheetah's apps.

49. CW1 is a former Account Manager who worked at Cheetah from September 2015 to January 2018. As an Account Manager, CW1 was responsible for the advertisement accounts of Cheetah customers including Facebook, Google, and Twitter.

50. CW1 stated that Cheetah used bots to make fraudulent clicks, and that this click fraud happened during CW1's entire tenure at Cheetah. CW1 said that management was aware of the fraudulent clicks, and knew that customers were charged for the fraudulent clicks.

51. CW2 is a former Overseas Sales Director who worked at Cheetah from November 2013 to November 2014. CW2 was one of the first ad agents for

Facebook and Google in China. CW2 confirmed that during the time CW2 worked at Cheetah, Cheetah used bots to generate false clicks on ads placed on its apps.

## Advertisers Reduce Their Advertising on Cheetah

52. That Cheetah relied extensively on bots to generate clicks on ads explains why Facebook decided in early 2016 to significantly reduce the amount of ads that it places with Cheetah.

53. According to a May 22, 2016 Wall Street Journal article titled "Facebook Tweaks Algorithm, Tripping Cheetah Mobile" (the "WSJ Article"), Facebook's new advanced metrics discovered that the ads that it placed on Cheetah did not perform well.

54. That Facebook's ads on Cheetah did not perform well is not surprising given that much of the clicks, and thus user traffic, were actually fake clicks generated by bots.

55. According to the WSJ Article, Facebook accounted for 25% to 30% of Cheetah's total ad revenue. Thus, Facebook's decision to reduce its ads on Cheetah is a significant setback to Cheetah.

56. Indeed, in its November 21, 2017 press release announcing Q3 2017 financial results, Cheetah admitted that revenue from its utility products, which includes ad revenue, decreased by 14.6% year-over-year. Cheetah admitted that this decrease was in part due to a "decline in revenue from mobile utility products and related services in the overseas markets, as certain ad formats have been discontinued by one of our overseas advertising partners."

57. The decline in Cheetah's advertising revenue stemmed from advertisers realizing that the ads they placed on Cheetah did not perform as well as the number of clicks would indicate – because the clicks were not made by potential customers, but by bots.

## ADDITIONAL ALLEGATIONS SUPPORTING SCIENTER

58. On October 27, 2017, Cheetah issued a rebuttal to the Prescience Report (the "Cheetah Rebuttal"). While the Cheetah Rebuttal responded to many of the allegations of fraud in the Prescience Report, it curiously said ***nothing*** about the Prescience Report's claim that Cheetah makes extensive use of bots and click farms to generate clicks on ads.

59. Based on Form 144s that Cheetah does not file publically,[1] Cheetah insiders, including Defendants Yeung and Fu, sold off massive amounts of their Cheetah holdings during the Class Period, making millions for themselves. In fact, in the five months before the publication of the Prescience Report, Cheetah insiders and affiliates sold approximately $76.91 million worth of Cheetah stock.

60. Defendant Yeung sold 91,275 shares of Cheetah stock on June 8, 2016, earning gross proceeds of approximately $1.03 million.

61. Defendant Fu sold 53,745,000 Cheetah shares in the IPO on May 8, 2014, pocketing gross proceeds of approximately $75.2 million. Fu sold an additional 200,000 shares of Cheetah stock on March 23, 2016, earning gross proceeds of approximately $3.6 million.

62. Defendant Fu also sold one million shares of Cheetah stock on June 8, 2016 through Sheng Global Limited, a British Virgin Islands company that Fu wholly owns, earning Fu gross proceeds of $11.0 million.

63. Defendant Fu sold an additional 2,345,000 shares of Cheetah stock through FaX Vision Corporation, a British Virgin Islands company in which Sheng Global Digital has a 66.7% ownership interest during the Class Period. On behalf of Fu, FaX Vison Corporation earned gross proceeds of $35.9 million from these sales.

---

[1] Plaintiff was able to obtain the Form 144s from Bloomberg Terminal.

64. All told, Fu and companies that he controls sold approximately $113.8 million in Cheetah stock during the Class Period.

65. Below is a condensed summary showing total proceeds pocketed by Cheetah insiders and affiliates from stock sales during the Class Period. A more detailed table is attached hereto as Exhibit 2.

| **Insider/Affiliate** | **Total Proceeds** |
|---|---|
| Sheng Fu | $113,846,409.04 |
| Ming Xu | $82,410,930.88 |
| Chenggong Fan | $2,275,699.00 |
| Jie Xiao | $3,134,009.00 |
| Ambition & Sincerity Ltd | $1,500,000.00 |
| Singularity | $6,550,000.00 |
| Ka Wai Andy Yeung | $2,149,545.75 |
| Liu Xinhua | $7,952,908.20 |
| Wider Land Limited | $6,102,241.00 |
| Pak Kwan Kau | $5,940,000.00 |
| Chen Yong | $3,508,000.00 |

66. Cheetah's auditor is Ernst & Young Hua Ming LLP ("Hua Ming"). Hua Ming has been the auditor for, and signed-off on the audits of, several high-profile China frauds in recent years, including:

a. Sino-Forest: found by the Ontario Securities Commission on July 14, 2017 to have used fictitious transactions to falsify revenue.

b. SinoTech Energy: delisted by NASDAQ, sued by the SEC in 2012 for falsifying assets.

c. China Agritech: delisted by NASDAQ in 2011 following a series of short seller reports stating that the company's financial statements were fraudulent.

67. Cheetah itself is currently under SEC investigation.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

68. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Cheetah ADSs during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.[2]

69. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Cheetah ADSs were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

---

[2] Also excluded from the Class are persons who have a net profit in purchases and sales of Cheetah ADSs or otherwise suffered no compensable damages under the securities laws during the Class Period.

70. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

71. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

72. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants' acts as alleged violated the federal securities laws;

(b) whether Defendants' statements to the investing public during the Class Period misrepresented and/or material facts about the financial condition, business, operations, and/or management of the Company;

(c) whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e) whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f) whether the prices of the Company's ADSs during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

73. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

74. Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

75. Alternatively, Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) the Company's ADSs are traded in efficient markets;

(d) the Company's ADSs were liquid and traded with moderate to heavy volume during the Class Period;

(e) the Company traded on the NYSE, and was covered by multiple analysts;

(f) the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's ADSs; Plaintiff and members of the Class purchased and/or sold the Company's ADSs between the time the Defendants failed to disclose

or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(g) Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

76. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## COUNT I

## Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Against All Defendants

77. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

78. This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

79. During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

80. The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and

others similarly situated in connection with their purchases of the Company's ADSs during the Class Period.

81. The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

82. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

83. As a result of the foregoing, the market price of the Company's ADSs was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's ADSs during the Class Period in purchasing the Company's ADSs at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

84. Had Plaintiff and the other members of the Class been aware that the market price of the Company's ADSs had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased the Company's ADSs at the artificially inflated prices that they did, or at all.

85. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

86. By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's ADSs during the Class Period.

## COUNT II

### Violation of Section 20(a) of The Exchange Act Against The Individual Defendants

87. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

88. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

89. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and operations, and to correct

promptly any public statements issued by the Company which had become materially false or misleading.

90. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's ADSs.

91. Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

92. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class Representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: February 15, 2018

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/ Laurence Rosen
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Counsel for Plaintiff

**CERTIFICATE OF SERVICE**

I, Laurence Rosen, hereby declare under penalty of perjury as follows:

I am an attorney with The Rosen Law Firm, P.A., with offices at 355 South Grand Avenue, Suite 2450, Los Angeles, CA, 90071. I am over the age of eighteen.

On February 15, 2018, I electronically filed the foregoing AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to counsel of record.

Executed on February 15, 2018

/s/ Laurence Rosen
Laurence Rosen